UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

DR. SHIMON WARONKER,

               Plaintiff,

    -against-

HEMPSTEAD UNION FREE SCHOOL DISTRICT,
BOARD OF EDUCATION OF THE HEMPSTEAD
SCHOOL DISTRICT, DAVID B. GATES, in his individual
and official capacity, RANDY STITH, in his individual
and official capacity, LAMONT E. JOHNSON,
in his individual and official capacity, and Patricia Wright
as a necessary party in her capacity as Clerk of the Hempstead
School District

               Defendants.

--------------------------------------------------------------X

ORIGINAL

FILED
IN CLERK'S OFFICE
DISTRICT COURT E.D.N.Y.

★ JAN 19 2018 ★

LONG ISLAND OFFICE

DOCKET NO.:

**COMPLAINT**

CV-18 0393

JURY TRIAL IS DEMANDED

HURLEY, J.

LOCKE, M. J.

    Plaintiffs, by his attorneys, THE LAW OFFICES OF FREDERICK K. BREWINGTON, as and for his Complaint against the Defendants, state and allege the following:

**PRELIMINARY STATEMENT**

    1.    This is a civil action seeking injunctive relief, monetary relief for violations of rights, brought pursuant to 42 U.S.C. § 1983, First and Fourteenth Amendments of the United States Constitution and Breach of Contract against the HEMPSTEAD UNION FREE SCHOOL DISTRICT, BOARD OF EDUCATION OF THE HEMPSTEAD SCHOOL DISTRICT, DAVID B. GATES, in his individual and official capabilities, RANDY STITH, in his individual and official capabilities, and LAMONT E. JOHNSON, in his individual and official capabilities. Defendants had no legal basis for the deprivation of Plaintiff's rights.

    2.    Specifically, the Plaintiff alleges that the Defendants wantonly, recklessly, knowingly and purposefully, acting individually and in conspiracy with each other, sought to deprive Plaintiff of employment, retaliation, misrepresentation, misinformation, character assassination, abuse and

manipulation of laws, rules and regulations.

3.     Said acts were done knowingly with the consent and condonation of the Defendant

HEMPSTEAD UNION FREE SCHOOL DISTRICT, BOARD OF EDUCATION OF THE

HEMPSTEAD SCHOOL DISTRICT, DAVID B. GATES, in his individual and official capabilities,

RANDY STITH, in his individual and official capabilities, and LAMONT E. JOHNSON, in his

individual and official capabilities, with the purpose of punishing, silencing, isolating, removing and

retaliating against DR. WARONKER, and generally violating his rights as protected by the United

States, Federal and State Statutes, and rules and regulations.

## JURISDICTION AND VENUE

4.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the aforementioned

statutory and constitutional provisions.  Plaintiff further invokes the pendent jurisdiction of this Court

to hear and decide claims arising under state law.

5.     Venue herein is proper under 28 U.S.C. § 1391(b); the cause of action arose in the

Eastern District of New York, and all of the parties reside, or are located in Nassau County.

## PARTIES

6.     Plaintiff DR. SHIMON WARONKER (hereinafter "Dr. Waronker") at all times relevant

to this Complaint, was employed by the Hempstead Union Free School District, Board of Education of

Hempstead School District as Superintendent.

7.     Defendant, HEMPSTEAD UNION FREE SCHOOL DISTRICT (hereinafter "School

District") during all time relevant to this Complaint was and is a Municipal Corporation duly organized

and existing by virtue of and under the laws of the State of New York.

8.     Defendant BOARD OF EDUCATION OF HEMPSTEAD SCHOOL DISTRICT

(hereinafter "The Board")  during all time relevant to this Complaint  was and is a Municipal

Corporation duly organized and existing by virtue of and under the laws of the State of New York.

9.     Defendant DAVID B. GATES, (hereinafter "Gates") sued herein individually and in his official capacity, during all times relevant to this Complaint, was and is an individual employed by the Hempstead Union Free School District, Board of Education of the Hempstead School District as a Trustee and member of the school board.

10.     Defendant RANDY STITH (hereinafter "Stith") sued herein individually and in his official capacity during, all times relevant to this Complaint, was and is an individual employed by the Hempstead Union Free School District, Board of Education of the Hempstead School District as a Trustee and member of the school board.

11.     Defendant LAMONT E. JOHNSON, (hereinafter "Johnson") individually and in his official capacity, during all times relevant to this Complaint, was and is an individual employed by the Hempstead Union Free School District, Board of Education of the Hempstead School District as a Trustee and member of the school board.

## FACTUAL BACKGROUND

12.     For the last three decades, the schools in the Hempstead School District were among the worst in the state. Hempstead suffers from a gap in funding that leads to disparities in class size, technology, and resources which impact academic progress.

13.     However, the District's failure to educate the children of Hempstead goes beyond a lack of resources. Decades of entrenched, incompetent and neglectful leadership has exacerbated the challenges faced by the District resulting in a disastrous educational system in Hempstead.

14.     Dr. Waronker's past successful transformative efforts in schools located in the South Bronx, Brownsville, and East Flatbush would enable him to do what was necessary for the Hempstead

3

School District.

15.    Dr. Waronker put forth an application with ECRA GROUP/HYA, who were recruiting applicants for the position of Superintendent. Dr. Waronker was successfully screened by ECRA GROUP/HYA on March 23, 2017.

16.    Dr. Waronker was scheduled for an in person with the Board on April 4, 2017 at the law offices of Hamburger, Maxon, Yaffe & McNall in Melville, New York. Upon arriving for said interview Dr. Waronker was advised by ECRA GROUP/HYA that the minority of the Board had put in a restraining order on the majority of the Board, because of the location of the interview.

17.    On April 13, 2017 Dr. Waronker had a video conference with all 5 members of the Board.

18.    On April 20, 2017 Dr. Waronker had an in-person interview at the Hempstead Public Library with all 5 members of the Board.

19.    Thereafter, the Board expressed their interest in hiring Dr. Waronker whereby they began to negotiate a contract.

20.    In negotiating said contract, Dr. Waronker expressed the importance of having the ability as Superintendent of working with organizations that he has worked with or been affiliated with in the past when transforming schools. The contract states the following:

"The Superintendent has had professional or financial relationships with organizations that he may recommend that the District enter into transactions in order to help the District attract, develop and retain talent to improve the instruction for students. These organizations include but are not limited to:

1. The Harvard Graduate School of Education;

2. The National Board for Professional Teaching Standards;

3. The New American Initiative; and

4. The New York City Leadership Academy.

4

"The Superintendent will not draw any compensation from the above entities during the term of this Agreement to eliminate any possible conflict of interest."

21.     Prior to the instant controversy, members of the Board of Education lacked the ability to put the interest of the children above personal, political and financial interests.

22.     In fact, in a recent Open Letter to the Community, Plaintiff Dr. Waronker stated, "[p]olitics, self-interests, patronage, vendettas, threats, and cover-ups cannot rule the day."

23.     It was not until 2014 when, by way of elections and the decisions by the New York State Commissioner of Education, there was a move to turn around a culture of nepotism and fear that has resulted in the inability of the administration to do an effective job setting direction; impeded the teachers' ability to educate; prevented the staff from supporting and promoting a culture of learning; and has muffled the voice of the parents, ultimately depriving the children of an adequate education.

24.     The District has been faced with numerous problems, including violence in the schools, dismal graduation rates, deplorable facilities and conditions, and illegal hiring practices, along with a lack of accountability.

25.     The District has an obligation to provide for the safety and well being of the children while they are on school grounds; however, this has not proven to be the case.

26.     For years, parents sought to implement a closed campus for Hempstead High School. One reason was to keep students from cutting class. Additionally, a number of parents and teachers often spoke of the danger that students faced when going off campus during lunchtime.

27.     Numerous fights that were stopped by security at the school were moved off of the school grounds and continued off the school grounds, sometimes at the behest of the guards. Numerous students were injured during school time, but the policy did not change.

28.     On December 7, 2017, as Dr. Waronker turned his car into the High School ground for

a Board meeting, people opened gunfire and riddled the corner house at that precise moment. The Board proceeded to have the meeting after the police secured the area.

29. On January 12, 2018 a fight broke out and the Principal, Mr. Ken Klein was injured when he made efforts to break up the fight.

30. Going back to November 16, 2004, a 17-year old student, Olman Herrera, was murdered while leaving Hempstead High School during lunchtime.

31. As a result of this horrific incident, and at the request of the New York State Department of Education, forty educational experts prepared a report entitled "The Hempstead Report."

32. The experts examined curriculum, instruction, safety, facilities and nutrition. The Hempstead Report stated that inadequate security, gang activity and a demoralized staff presented serious shortcomings for the District. Unfortunately, the school did not heed the Hempstead Report's warnings. Many of these ills remained at the time of the hiring of Dr. Waronker in the summer of 2017.

33. Racial tension between African-American students and Latino students has also existed for decades.

34. Prior to the election of Maribel Toure, Gwen Jackson and Melissa Figueroa, the school District failed miserably at implementing any sort of measures by which to address cultural competency issues, including racial violence.

35. This began to change in 2015, and was further changed for the better with the hiring of Dr. Waronker, who is a bilingual Spanish speaker born in Santiago, Chile.

36. While more than sixty percent (60%) of the current Hempstead student body is Latino, and a large proportion of these students are monolingual Spanish speakers, very few security personnel, support staff, administrators, teachers, assistants or para-professionals speak Spanish.

37.     At the time of the hiring of Dr. Waronker, there were no building principals in any of the schools who are of Latino ethnicity, and none were known to be Spanish speakers.

38.     Historically, the few bilingual teachers throughout the District were known to have their classes interrupted when they were pulled to go to administrative offices to translate.

39.     Usually those were exceptional instances in which a parent had refused to leave until a particular problem was addressed. More often, Latino parents languished while their needs and concerns went unheard.

40.     This trend began to reverse itself starting in 2015 when the Board majority shifted, and then was further improved when Dr. Waronker began reshaping the structure of administration, services and education in the District.

41.     Hempstead Schools have suffered dismal graduation and grade inflation.

42.     In May of 1992, there were six candidates vying for two seats on the Board of Education. Their main talking points were poor test scores and deplorable graduation rates. Fast forward to 2014, when seven candidates were vying for two seats; the talking points remained the same. The numbers tell a damning story.

43.     In 1991, only twenty seven percent (27%) of Hempstead High School's students graduated on time, and thirty eight percent (38%) were absent or late every day.

44.     In 1997, only six (6%) percent of Hempstead High School seniors graduated with a Regents diploma, and less than half of the third graders in the six elementary schools could read at grade level.

45.     The District was failing to help children achieve even the minimum standards required by the State. The District was certainly not prepared to move to the much more rigorous all-Regents standard.

46.     In 2003, the graduation rate in Hempstead was a meager thirty eight percent (38%).

47.     In the Middle School only twenty nine percent (29%) of Hempstead students met standards in English, and forty-three percent (43%) met standards in Math. This sharp decline in the eight graders' scores made matters in the high school that much more grim.

48.     In 2014, it was learned, yet again, that the graduation rate was thirty eight percent (38%).

49.     The difference this time was that the District, it was learned, reached the thirty eight percent (38%) threshold through grade inflation, an unofficial but widespread grade fixing scandal that was common practice in the District.

50.     A New York State Department of Education audit found that close to 2,000 grades were changed, resulting in students who earned failing grades of sixty-two through sixty-four percent (62%-64%) receiving passing grades of sixty-five percent (65%).

51.     In 2017, Dr. Waronker reviewed over 1,500 high school students' transcripts with the guidance counselors, and found that approximately 75 percent (75%) of Hempstead High School seniors will not graduate and will not earn a high school diploma.

52.     The teachers shared that students who took Algebra and failed were placed in Geometry, and if they failed Geometry they were placed in Trigonometry.

53.     With respect to the middle school Dr. Waronker learned that students are promoted even if they fail all of their classes. Additionally, many students who come in and are unable to read or write. Also, reading specialists were eliminated, but there was no expertise in the classrooms to help students who were so far behind the curricular standard.

54.     In the High School English Department 90% of students are level 1 in 8th Grade, yet placed in Honors English.

55.     In the High School Social Studies Department students are placed in US History Regents

8

in 9th Grade. This course is given across the State in 11th Grade for its developmental and cognitive requirements. Only 17% of our students pass the exam.

56. In the High School Science Department Chemistry used to have two passing course requirements (Algebra and Biology) as they are building blocks for the course. Students are placed in Chemistry without any course requirements.

57. In the High School English Language Learners Department some teachers have between 40-50 students in their classes and they had a plan almost entirely funded by the State for the SIFE (Students with Interrupted Formal Education) that would require 4 classrooms, but were told there was no space. Students are not placed according to Part 154; meaning that students who have gained more proficiency in English are not placed in more English classes as per State Regulations.

58. Teachers have said that students can take the Regents exams without having to attend classes, yet teachers are graded on the student performance.

59. An analysis of school year 2011-12 enrollments show a consistent, District-wide census count in grades 1-5 of 450 to 500 students per grade. These numbers drop by approximately 50 to 100 students during the middle school years (grades 6-8).

60. It is during these grade levels that many parents in the District make the sacrifice of sending their children to charter and private schools, knowing that a serious drop in academic achievement occurs during such formative and critical years.

61. In grade 9, there is a doubling of the school census. The increase is a result of social promotion (a practice whereby students are promoted to the next grade purely to keep them with peers of their own age and without regard to their demonstrated mastery of the appropriate academic material) and the lack of resources and structure that exist in the high school.

62.     A census count of high school students is over 800 in freshman year, but the senior class is close to 250.

63.     The fact that no intervention or corrective plan has been put in place is simply preposterous.

64.     The facilities of the District have been in deplorable condition throughout most of the past three decades. Many of these leaky, crumbling buildings have been contaminated with asbestos, mold and rats, and have had numerous heating, ventilation and air conditioning problems.

65.     In 1990, asbestos was found in Hempstead High School.

66.     The removal of the asbestos carried a price tag of $1.9 million.

67.     The abatement process was riddled with myriad issues and scandals, including budget overruns and sloppy work resulting in asbestos being left in classrooms.

68.     Hundreds of thousands of dollars were simply unaccounted for. The District refused to acknowledge a problem.

69.     In March of 2004, a blackboard fell off a wall, exposing asbestos left over from the botched clean up, indicating that thousands of children and adults had been exposed to asbestos for more than a decade.

70.     During this time the building had to be shut down for a week in an effort to address these issues. Currently, complaints and sickness by teachers continues with little or no response or abatement of the concern and condition.

71.     In the fall of 2017, Dr. Waronker performed a facilities review that found 1,600 students in crumbling and moldy trailers, some of which are 34 years old, unmaintained and decaying boilers, flooding, and graffiti that was more than 13-years old.

72.     In fact, as it was reported in Newsday, the High School was shut down on January 2,

2018 because ten classrooms were flooded due to a burst pipe and four burst toilet pipes.

73.     The hiring practices implemented by the District are best encapsulated by the terms "patronage" and "nepotism".

74.     Whom an applicant knows is much more important than their academic and professional experience, or their ability and their skill set.

75.     As a result, a number of former Board Members work for the District upon their leaving the Board and/or have had family appointed during or after their tenure on the Board.

76.     In an examination of payroll records for the immediate years prior to 2017-2018 a study revealed 295 payroll distributions to 129 individuals who were not active employees at Hempstead at the time of the payroll distribution.

77.     As troubling was the fact that there were 500 employees who were paid as vendors during fiscal years 2013-2017. A preliminary report recently issued by forensic auditors, hired after Dr. Waronker undertook his duties, revealed disturbing yet astounding facts about the issues of financial mismanagement and a clear absence of fiscal controls in the past.

78.     Moreover, the District has been completely remiss in maintaining the consistent and effective leadership which is critical to properly preparing children for life. There has been an administrative revolving door in a number of key principal positions and in the position of Superintendent.

79.     The rapid succession of leadership changes is almost impossible to follow.

80.     In October 2004, Superintendent Nathaniel Clay was fired and replaced by Susan Johnson.

81.     The Board reinstated Nathaniel Clay that same December when the state found he had been fired illegally.

82.     The Board subsequently suspended him and replaced him for a second time with Johnson.

83.     She was fired in July 2005, and Clay was hired for a third time.

84.     When Clay retired in 2008, Joseph Laria assumed the position on an interim basis. Patricia Garcia was selected to fill the vacancy in 2009.

85.     Eventually, Superintendent Garcia was forced to resign by the Board.

86.     Upon her resignation, she received a payout of nearly $320,000. [Beside the Superintendent debacle in 2004-05 and the massive payout to former Superintendent Garcia, Mr. Carlos Ramirez, the administrator who informed state officials about the District's practice of systematically inflating grades was subjected to retaliation and fired for it.]

87.     As Ms. Garcia's replacement, Susan Johnson was once again rehired, marking her third stint in the position.

88.     In 2016, Superintendent Johnson's salary was scheduled to peak at $265,000, with supplemental merit pay as high as $40,000 annually based on her performance.

89.     For perspective, the salary of most Long Island school superintendents during the 2011-12 school year ranged from $200,000 to $280,000.

90.     Superintendent Johnson, who did not hold a doctorate degree, remained employed until spring of 2017 when her contract was not renewed and she was fully paid.

91.     The question of the full payment of that contract to Ms. Johnson when the school district continued to underperform and continued to be plagued with such intractable challenges led to a national search for an educational leader that would change the course and culture that the District was languishing in and the effort to have Ms. Johnson return mystified community members.

12

92.   The fact that there was opposition to a national, or at very least regional, search was alarming.

93.   In 2010 Defendant Stith pled guilty to a second-degree harassment violation, for assaulting a woman with a bottle of bleach, splashing the chemical in her eyes. Stith served five (5) days in jail and paid $200 in fine, $120 in court surcharges and received one-year conditional discharge.

94.   On May 10, 2017 Dr. Shimon Waronker was hired after an extensive national search and interview process in which some current Board Members refused to fully participate and made every effort to derail the search and selection process.

95.   Despite the efforts to the contrary, Dr. Waronker began his work one month earlier, than planned, June 2, 2017, to ensure smooth transition, to avoid the loss of opportunities for the exchange of information, to begin to learn about the staff and to begin to organize for the academic year.

96.   An audit of Title I funds in 2002-03 found that out of 150 computers purchased, it could only locate 100 of them.

97.   Eventually after a thorough District-wide search, 30 more were accounted for. Nonetheless, 20 could not be found. A projector and laptop were missing. $22,258 was spent on food and catering.

98.   An audit in 2004 by the state highlighted the "uncontrolled, inappropriate and wasteful spending" of the District.

99.   The audit found that the Board of Education spent $2.3 million to install and rent portable classrooms because it missed a deadline for submitting a construction bond issue to voters. Contracts in the amount of approximately $1.3 million were awarded without competitive bids, sometimes with sketchy provisions and payments exceeding the agreed upon price.

100.     Approximately $1.1 million was paid to temporary employment agencies without proper approvals and without analysis of their cost effectiveness.

101.     The state comptroller said his audit showed about $5.1 million was spent carelessly over two years.

102.     In December of 2014 the New York State Comptroller, Thomas P. DiNapoli, issued a 50 page audit report which revealed serious questions about financial decisions, lack of transparency and "a neglect of sound fiscal and administrative practices and a disregard for the interests of taxpayers." Hempstead Union Free School District, Management of District Resources, Report of Examination Period Covering July 1, 2011 - March 31, 2013.

103.     This report, details issue by issue the continued financial concerns which plagued the District.

104.     One of the many concerns in the report centered around over payments to the then interim superintendent, Susan Johnson of $11,026 more per paycheck than should have been paid to her for a series of paychecks.

105.     The report pointed out that despite these bi-weekly overpayments, the superintendent did not inform the school board of these overpayments and that the higher payments were made on the instructions of a former school board member.

106.     In 2014, the District was paying close to eight million dollars ($8,000,000) annually in transportation services to bus the hundreds of children who attend private and charter schools outside of the District.

107.     The neighboring school district in Uniondale spent approximately three million dollar ($3,000,000) for transporting the entire school district.

108.     Competitive bidding and a competent transportation director would have resulted in

14

providing busing for the entire District at a fraction of the cost.

109.    Once again, this fact was revealed to the community and upon the hiring of Dr. Waronker, policies and procedures were implemented to address and curb this money hemorrhage by the District.

110.    In June of 2014, in a so called "Special Meeting" which was called by Board President Betty Cross in clear violation of the open meetings laws, three (3) members of the Board met on less than 24 hours notice, in non-compliance to Public Officers Law, Article 7, §104 and voted, among other things, to: Indemnify themselves for all matter "surrounding the events of the May 20, 2014 budge vote and election" and; Revise the School District Budget of 2013-2014 and authorized the use of $1,500,000 to fund "ordinary contingent expenditures related to increased enrollment and litigation expenses".

111.    Once the majority that made the June 2014 decision was unseated, new legal counsel was hired and in a recent report released by the Commissioner and issued by the Distinguished Educator appointed by the New York State Commissioner of Education, a comparison of what the district spent for legal fees was done.

112.    The Board has a long history of ineptitude and infighting.

113.    The failure of this school system has been well documented through three decades of abysmal statistical data revealing high failure and drop out rates and low graduation rates.

114.    The injuries suffered as a result of this ineptitude are not only seen in low educational attainment, but have literally resulted in the death of students on and near campus.

115.    Decisions by the New York State Commissioner of Education have spoken to the endemic failure, which cries out for much needed change in Hempstead.

116.    In the past, the District has threatened parents who ask tough questions with expulsion from meetings and was willing to go to great lengths in threatening staff, teachers and administrators

who speak up about the schools' dysfunction and the illegal practices in which they engage.

117.　Additionally, the District has had police waiting just outside the meeting door threatening parents and members of the public with arrest, or having security guards present in the meeting who physically intimidated residents to remain silent and not exercise their right to question and petition its School Board for answers.

118.　Most recently, a group called Hempstead for Hempstead began to disrupt public Board meetings, being chaired by President Maribel Toure. The disruptions included making racially offensive comments, vulgar statements, and engaging in intentionally physical acts which prevented the taking of a vote. ·

119.　These acts included acts of intimidation and physical threats of violence against Ms. Toure and Ms. Gwen Jackson.

120.　Upon his taking office, Dr. Waronker brought in as his Deputy Superintendent a man who transformed one of the 12 most violent schools in NYC like he had, to help him tackle the violence that Hempstead had known for too long.

121.　Dr. Waronker, along with the then majority of the Board, brought in much needed Special investigators to begin to root out the corruption and mismanagement as well as hired a Forensic Auditing Firm to look deeply into the books.

122.　It was a troubling fact that a great deal of financial records were burned prior to Dr. Waronker's arrival in February 2017 - just when the RFP for the Forensic Auditors was due.

123.　Dr Waronker rolled up his sleeves, and did a facilities review and inspected every inch of the buildings.

124.　He found decaying boilers without maintenance, vermin infestations, flooding, 1600 students in trailers, a building named Rhodes that has been abandoned for 17 years, and unabated graffiti

going back to 2004 in many buildings.

125.     In June 2017 with the Board's approval, New American Initiative was hired to help Dr. Waronker establish innovative and sustainable practices in the District. Additionally, four Master Teachers were hired to help improve the pedagogy of the District.

126.     On July 5, 2017, Dr. Waronker met Randy Stith for the first time and shook hands. Stith publicly said during a board meeting to Dr. Waronker that he was happy to shake his hand as Dr. Waronker would be removed and he (Stith) would be saying goodbye very soon.

127.     Dr. Waronker terminated Assistant Superintendent for Business and Operations due to his inability in disclosing to Dr. Waronker how much money there was in the bidget in June of 2017.

128.     Dr. Waronker also terminated High School principal Stephen Strachan for serious issues that Dr. Waronker felt he could not grant him tenure.

129.     The aforementioned named group, "Hempstead for Hempstead", founded by Thomas Parsley, told Dr. Waronker that if he terminated Principal Strachan that there would be war.

130.     Thomas Parsley had been a prior Board member. Parsley had been previously convicted of Grand Larceny and removed from the Board. Additionally, Parsley had also been arrested and convicted as a 3rd Degree Sexual Offender.

131.     In July 2017 Lamont Johnson was removed pursuant to a finding of a Hearing Officer.

132.     On November 27, 2017, Commissioner of Education Elia reappointed Mr. LaMont Johnson back on the Board and the voting majority shifted.

133.     At that point, Dr. Waronker's ability to continue to improve academic outcomes and root out the corruption also changed.

134.     Dr. Waronker had arranged a conflict mediation training for the Board and Cabinet level officers during August 20th - 22nd of 2017. Trustees Maribel Toure, Gwen Jackson and Crosson attended.

Trustees Gates and Stith refused to attend.

135.    Dr. Waronker asked Gates why he did not attend and had he not given Dr. Waronker his cell phone number so that they can have a dialogue. Gates responded in front of sevel Board members, lawyers, and others "I don't trust you. You are my enemy."

136. Dr. Waronker responded that he was not his enemy and that everyone had to eb on the same side to help the children.

137.    In June 2017 the Board approved the hiring of Plante Moran, forensic auditors. In September, there was still no contract with Plante Moran. The Board's General Counsel, John Sheahan from Guercio and Guercio, was opposed to certain contractual terms.

138.    In October, the Board President, Maribel Toure and Dr. Waronker went to visit the offices of Guercio and Guercio and met with Greg Guercio and questioned why there was such difficulty with the contract. Greg Guercio recommended that the Board use a local forensic firm. Dr. Waronker and Maribel toure responded that it was unacceptable as in order to uncover the corruption we needed a national firm without connection to Hempstead.

139.    Guercio and Guercio were demanding an unreasonable term in the contract with Plante Moran concerning unlimited indemnification.

140.    Soon thereafter the meeting, in October, the District had a contract with Plante Moran.

141.    Over a year after the Board had voted to hire a Forensic Auditing firm, a fire that destroyed the records and my constant pressing for a contract, the District finally had an agreement.

142.    In late September, the Commissioner of Education Appointed Dr. Jack Bierwirth as a Distinguished Educator to oversee the Hempstead School District. Only one other District in New York State, Buffalo School District, received this oversight.

143.    The Board's past demonstrably incompetent leadership and willingness to engage in

illegal activity has been repeated by the most recent return of the majority vote to members who most

recently engaged in acts that made no sense.

144.    On November 29, 2017, one of the first things the Board did was to fire the Special

Investigators who were looking at abuse, mismanagement and possible corruption. They did this in an

emergency session, and  was the only action they took in that emergency session.

145.    On December 6, 2017 Plaintiff sent each of the Board members, including these

Defendants letter via email which reads:

> As you know, since my arrival here in Hempstead, my primary focus has been to
> raise the bar for us in the District in terms of our effective delivery of services for
> our children and to uplift the reputation of this District as it returns to being the top
> notched educational system that it is capable of being.
>
> My efforts have allowed me to see the best of our District from the brilliance of our
> Pre-K to our 12th Grade students to the dedicated expertise of our teachers and
> teaching assistants. I have been convinced that with all of us pulling together we can
> elevate all that we do and all that we produce. Unfortunately, I have seen things that
> I know are holding us back and that I believe must be addressed before the heights
> we seek can be achieved.
> To that end, I am advising the Board that after raising questions about suspected
> illegal financial activity to members of the District, no corrective action has taken
> place. As a fiduciary and as a guardian of the public trust I have been compelled to
> consult with several law enforcement agencies on the local, state and federal level
> about disturbing facts which have become apparent to me, which I felt could not and
> should not be occurring. These matters are of a nature that endanger the public
> health, welfare, and safety of our district and appear to be both unlawful and
> unethical, and required disclosure to, and an evaluation by, governmental offices
> outside the confines of the Hempstead School District.
>
> The need to provide this information was mandated by two factors: first, the fact that
> instead of corrective action, I am seeing the opposite; and second, my professional,
> moral and legal obligation to serve the District and those who are truly the
> consumers – our children --, and the community at large.
>
> Educationally yours,
> Shimon Waronker, Ed.D.
> Superintendent of Schools

146.    On December 7, 2017 in another meeting,   Dr. Waronker recommended to the Board that the District tear down the Rhodes building and propose a Bond issue to rebuild a school on the site. The Board voted down the resolution 3 to 2.

147.    On December 22, 2017, the Board, without any notice, suspended Dr. Waronker's authority and proceeded to fire the expert teachers he had hired.  This was a 3 to 2 vote as well.  Even though, these teachers were working 12-14 hours a day and had almost completed an application for a $5.4 million dollar grant for the district in addition to all their  other responsibilities.   These hard-working teachers were let go right before the holidays!

148.    Also on December 22, 2017, the Board terminated its contract with the New American Initiative, which was leading the transformative work with listening and communicating skills, conflict mediation, reflective and collaborative hiring practices, helping develop the Strategic Plan for the district, making the delivery of teaching more effective, as well as many other necessary programs and improvements.

149.    The Board effectively pulled the rug from under Superintendent Waronker and derailed the plan set in place to reverse the downward spiral.

150.    As part of Dr. Waronker's pledge to be transparent and to keep the Community involved, Dr. Waronker distributed an open letter to the Community dated January 5, 2018 and posted same on the District website.

151.    That letter, which has since been taken down by the Board, provided a detailed report of the work done during the first six (6) months of the school year and what it would take for the District to stay on the positive track.  Entitled, "Collaborate and Elevate", the letter urged the Community to

come together to address the needs of the District. As part of that letter, Dr. Waronker wrote in selective

part:

> Collaborate with me to make Hempstead Schools thrive again. If we are honest, the need of
> working together on all these levels must be admitted as something that is obvious.
> Politics, self-interests, patronage, vendettas, threats, and cover-ups cannot rule the day.
> Our collective goal must be to elevate the standards for all involved in and attached to the
> Hempstead School District. The transformation which is necessary in Hempstead will not
> happen without hard work, transparency, honesty and commitment to meaningful change.

> I am asking everyone from the students of Hempstead to the staff to the Board Members to the
> Commissioner of Education to the citizenry at large to work together to help those who are
> most vulnerable - our children. While some may see this as a noble cause, it is more than that.
> It is imperative! The future success of the community is tied to the value we place on the
> success of each of our children.

152. Then on January 9, 2018, the Board voted 3 to 2 to place Dr. Waronker on

"Administrative Leave of Absence With Pay, Effective Immediately."

153. This act was nothing more than a suspension of Dr. Waronker with no warning, with no

notice, with no charges or specifications, and with no hearing or any sort of protections that could be

considered due process.

154. That same night the Board adopted a modified Administrative Leave of Absence With

Pay Policy, which had been changed several times from November 29, 2017 and was even amended on

January 9, 2018, the date it was adopted and then used against Dr. Waronker.

155. Also on January 9, 2018, the master teachers who were fired, decided to volunteer their

work and finish their efforts to complete the application for a $5.4 million dollar grant for the district.

156. Shockingly, the Board issued a "hand-carry" resolution directing the District's

Superintendent to "prohibit the Master Teachers who were excessed on December 21, 2017, and are no

longer employees of the District, effective December 22, 2017, from volunteering to provide services

or rendering any services to the District."

## AND AS FOR COUNT ONE
## 42 U.S.C. § 1983 MONELL CLAIM-MUNICIPAL LIABILITY

157. The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 156 of this Complaint with the same force and effect as though fully set forth herein.

158. The Defendants SCHOOL DISTRICT, THE BOARD, GATES, STITH, and JOHNSON, subjected Plaintiff DR. WARONKER to the foregoing acts and omissions without due process of law in a violation of 42 U.S.C. § 1983 thereby depriving Plaintiff of his rights, privileges and immunities secured by the Fourteenth Amendment of the United States Constitution.

159. Defendants through their actions, violated the due process rights guaranteed to DR. WARONKER under the Fourteenth Amendment of the United States Constitution.

160. Plaintiff, DR. WARONKER was not provided the opportunity for a fair hearing prior to being deprived of a constitutionally protected liberty or property interest.

161. The Board was barred by contract from terminating the employment relationship without cause.

162. Plaintiff, as a public employee, who can only be discharged for cause, has a constitutionally protected property interest in his tenure, and could not be fired without due process.

163. Defendants have denied Plaintiff due process of law by not providing a hearing before an impartial hearing officer resulting in a wrongful, and unlawful leave of absence, and a termination of a constitutionally protected liberty or property interest.

164. Defendants, acting under color of law, and through their employees servants, agents and designees, have engaged in a course of action and behavior rising to the level of a policy, custom, and condoned practice, which has deprived Plaintiff of rights, privileges and immunities secured by the

Constitution and laws in violation of 42 U.S.C. §1983. These actions were condoned, adopted and fostered by policy makers including but not limited to Defendants.

165.    Defendants have consistently sought to intimidate, deprive due process rights and silence persons like Plaintiff. They have engage in actions and abuses which violate and deny employee's their rights as provided under the First and Fourteenth Amendments of the United States Constitution. Defendants have done so by using employment status, conditioning employment, altering terms of employment, and stated roles, of employees, including Plaintiff and retaliating and coercing them for reporting to governmental agencies, the Commissioner of Education and law enforcement and speaking publicly against and opposing improper and wrongful actions by Defendants. Employees' have been sanctioned, disciplined and punished contrary to their First Amendment and Fourteenth Amendment rights when they attempt to speak reason and truth about actions being taken when they speak on matters of public concern.

166.    Defendants' infringement upon and violation of the rights, described herein including those protected under the First and Fourteenth Amendments of the United States Constitution, was and is intended to silence Plaintiff and those like Plaintiff and to place a chilling effect upon the exercise of such rights by Plaintiffs and other persons, who would raise issues about wrongful and improper actions being taken in the School District including but not limited to hiring, use of funds and other areas of public concern. Further, Defendants have sought to, and have treated employees, like and including Plaintiff, as they have in violation of their contractually protected rights.

167. By silencing, punishing, causing these persons including Plaintiff to suffer suspension, discipline, termination and other diminished aspects of their professional and personal lives, and adverse employment actions. Defendants have sought to unlawfully eliminate voices and persons asking probing questions and have sought to deter employees including but not limited to the Plaintiff and other persons from exercising their civil, statutory and Constitutional rights.

168. Further, Defendants have sought to restrain, limit and preclude Plaintiff and other such individuals, including, but not limited to, Plaintiff, from access to government and full airing of concerns for discussion, response and action.

169. As a direct and proximate result of said acts, Plaintiff and others like him have suffered and continue to suffer irreparable harm, diminished employment, loss of income, loss of other employment benefits, injury to reputation and good name, being subjected to scandalous claims and investigations and have suffered and continues to suffer distress, humiliation, great expense, embarrassment, and damages to her reputation.

170. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer demotion, suspension, leave of absence, diminished employment, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damage to this reputation.

171. As a result of Defendants' acts, Plaintiff suffered and is entitled to, damage sustained to date and continuing in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

## AS AND FOR A SECOND COUNT
## PURSUANT TO 42 U.S.C. § 1983 FOURTEENTH AMENDMENT, DUE PROCESS

172. The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 171 of this Complaint with the same force and effect as though fully set forth herein.

173. Defendants violated 42 U.S.C. §1983 by retaliating against Plaintiff when Plaintiff began to conduct in depth investigations in the Defendant SCHOOL DISTRICT to root out the corruption and mismanagement in hopes of transforming Hempstead schools.

174. Plaintiff, DR. WARONKER as Superintendent of Defendant SCHOOL DISTRICT performed investigations and reviews on issues that are a matter of public concern.

175. Plaintiff's acts in disclosing information, obtained from his thorough review of the Defendant SCHOOL DISTRICT and its buildings as Superintendent collectively resulted in Plaintiff's disciplinary action, thereby mandating DR. WARONKER to take a forced leave of absence.

176. Plaintiff's discovery and further disclosure of information against Defendants motivated said Defendants to implement adverse actions upon Plaintiff, including but not limited to a forced leave of absence.

177. By silencing, punishing, causing Plaintiff to suffer the disciplinary action of a forced leave of absence, and an alteration of the terms and conditions of DR. WARONKER'S employment. Defendants have sought to unlawfully retaliate against the Plaintiff, silence him, and thereby block, limit and deter the Plaintiff and other persons from exposing wrong doing, public abuses, violations of law and exercising their civil, statutory and constitutional rights.

178. Further, Defendants have sought to restrain, limit and preclude Plaintiff and other individuals, from access to Hempstead School property and full airing of concerns and wrong doing for disclosure, discussion, response and action.

179. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer demotion, suspension, leave of absence, diminished employment, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damage to this reputation.

180. As a result of Defendants' acts, Plaintiff suffered and is entitled to, damage sustained to date and continuing in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

## AS AND FOR A THIRD COUNT
## PURSUANT TO 42 U.S.C. § 1983 - FIRST AMENDMENT

181.    The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 180 of this Complaint with the same force and effect as though fully set forth herein.

182.    On December 6, 2017 Plaintiff sent a letter to Defendants stating in relevant part, "[t]o that end, I am advising the Board that after raising questions about suspected illegal financial activity to members of the District, no corrective action has taken place. As a fiduciary and as a guardian of the public trust I have been compelled to consult with several law enforcement agencies on the local, state and federal level about disturbing facts which have become apparent to me, which I felt could not and should not be occurring. These matters are of a nature that endanger the public health, welfare, and safety of our district and appear to be both unlawful and unethical, and required disclosure to, and an evaluation by, governmental offices outside the confines of the Hempstead School District." This was just one of the actions Plaintiff did to address the actions which he reasonably and in good faith, believes violates the law, rules and regulations governing said actions and behavior which presents a substantial and specific danger to the public health or safety.

183.    As part of Dr. Waronker's pledge to be transparent and to keep the Community involved, Dr. Waronker distributed an open letter to the Community dated January 5, 2018.

184.    The Defendants, collectively and each one of them individually, have engaged in actions and abuses which violate and deny Plaintiff his right as provided under the First Amendment of the Untied States Constitution. Defendants have done so by conditioning Plaintiff's employment, terms of employment, conditions of employment, and stated roles, on Plaintiff's not speaking publicly against and opposing Defendants, and Plaintiff's not telling the truth, not providing the public with relevant information and raising issues of wrong doing, possible criminal activity and improper actions concerning the fiscal and personnel operation of the Defendant SCHOOL DISTRICT, THE BOARD

GATES, STITH,, and JOHNSON and limiting Plaintiff's First Amendment right to free speech while attempting to speak reason and truth as a concerned citizen and employee of the Defendant SCHOOL DISTRICT, and THE BOARD on matters of public concern.

185.    Defendants' infringement upon and violation of Plaintiff's rights, protected under the First Amendment of the United States Constitution, was and is intended to silence Plaintiff and to place a chilling effect upon the exercise of such rights by Plaintiff and other persons, who would raise issues about wrongful and improper actions being taken by the SCHOOL DISTRICT, and by THE BOARD and more specifically in use of Federal monies, improper hiring practices and violation of Federal laws, State Laws and Civil Service Rules and Regulations. Said violative acts were and continue to be in violation of public policy and Defendants' responsibility to the public as elected to be members and trustees of the Board. Further, Defendants have sought to and have treated Plaintiff DR. WARONKER, as they have in violation of his First Amendment rights.

186.    By silencing, punishing, causing Plaintiff to suffer the disciplinary action of a forced leave of absence Defendants have altered the terms and conditions of DR. WARONKER'S employment. Defendants have sought to unlawfully retaliate against the Plaintiff, silence him, eliminate his voice, and thereby block, limit and deter the Plaintiff and other persons from exposing wrong doing, public abuses, violations of law and exercising their civil, statutory and constitutional rights.

187.    Further, Defendants have sought to restrain, limit and preclude Plaintiff and other individuals, from access to Hempstead School property and a full airing of concerns and wrong doing for disclosure, discussion, response and action.

188.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer demotion, suspension, forced leave of absence, diminished employment, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damage to this reputation.

189.     As a result of Defendants' acts, Plaintiff suffered and is entitled to, damage sustained to date and continuing in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

## AS AND FOR A FOURTH COUNT
## PURSUANT TO WHISTLEBLOWER PROTECTION, NY CIVIL SERVICE LAW §75-B; NY LABOR LAW §215 §740 AND NY EDUCATIONAL LAW §3028-D

190.     The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 189 of this Complaint with the same force and effect as though fully set forth herein.

191.     On December 6, 2017 Plaintiff sent a letter to Defendants stating in relevant part, "[t]o that end, I am advising the Board that after raising questions about suspected illegal financial activity to members of the District, no corrective action has taken place. As a fiduciary and as a guardian of the public trust I have been compelled to consult with several law enforcement agencies on the local, state and federal level about disturbing facts which have become apparent to me, which I felt could not and should not be occurring. These matters are of a nature that endanger the public health, welfare, and safety of our district and appear to be both unlawful and unethical, and required disclosure to, and an evaluation by, governmental offices outside the confines of the Hempstead School District." This was just one of the actions Plaintiff did to address the actions which he reasonably and in good faith, believes violates the law, rules and regulations governing said actions and behavior which presents a substantial and specific danger to the public health or safety.

192.     The Defendants, THE DISTRICT, THE BOARD, GATES, STITH, and JOHNSON collectively and each one of them individually, have engaged in actions and abuses which violate and deny Plaintiff his right as provided under the Civil Service Law, Labor Law and Education Law of the State of New York. Defendants have done so by conditioning Plaintiff's employment, terms of

employment, conditions of employment, and stated roles, on Plaintiff's not reporting and disclosing to the Commissioner, New York State Education Department, authorized representatives, or to the attorney general or any law enforcement agency or other persons, that the Defendant District and its employees have engaged in conduct that the Plaintiff, reasonably and in good faith, believes violates the law, rules and regulations governing said actions and behavior which presents a substantial and specific danger to the public health or safety.

193.     Plaintiff has been punished for speaking publicly against and opposing Defendants in their wrongful actions, and Plaintiff's disclosing to the Commissioner, New York State Education Department, authorized representatives, or to the attorney general or any law enforcement agency or other persons by providing information discovered and providing the those persons with relevant information and raising issues of wrong doing, financial practices, possible criminal activity and improper actions concerning the fiscal and personnel operation of the Defendant SCHOOL DISTRICT and action which he believed to be a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety.

194.     Defendants' infringement upon and violation of Plaintiff's rights, protected under the First Amendment of the United States Constitution, was and is intended to silence Plaintiff and to place a chilling effect upon the exercise of such rights by Plaintiff and other persons, who would raise issues about wrongful and improper actions being taken by the SCHOOL DISTRICT, and by THE BOARD and more specifically in use of Federal monies, financial practices, improper hiring practices and violation of Federal laws, State Laws and Civil Service Rules and Regulations and Labor Law. Said violative acts were and continue to be in violation of public policy and Defendants' responsibility to the public as elected to be members and trustees of the Board. Further, Defendants have sought to and have treated Plaintiff DR. WARONKER, as they have in violation of his protected Rights.

29

195. By silencing, punishing, causing Plaintiff to suffer the disciplinary action of a forced leave of absence Defendants have altered the terms and conditions of DR. WARONKER'S employment. Defendants have sought to unlawfully retaliate against the Plaintiff, silence him, eliminate his voice, and thereby block, limit and deter the Plaintiff and other persons from exposing wrong doing, public abuses, potentially criminal acts, violations of law and exercising their civil, statutory and constitutional violations and exposing actions and behavior which presents a substantial and specific danger to the public health or safety.

196. Further, Defendants have sought to restrain, limit and preclude Plaintiff and other individuals, from access to Hempstead School property and a full airing of concerns and wrong doing for disclosure, discussion, response and action despite the clear danger of actions and behavior which presents a substantial and specific danger to the public health or safety.

197. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer demotion, suspension, forced leave of absence, diminished employment, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damage to this reputation.

198. As a result of Defendants' acts, Plaintiff suffered and is entitled to, damage sustained to date and continuing in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

## AS AND FOR FIFTH COUNT
## BREACH OF CONTRACT

199. The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 198 of this Complaint with the same force and effect as though fully set forth herein.

200.     Plaintiff DR. WARONKER entered into a valid binding written contract with and Defendants THE BOARD.

201.     The contract was drafted by the Defendant THE BOARD.

202.     The contract was signed by Plaintiff DR. WARONKER on May 10, 2017.

203.     The contract was signed by the President of THE BOARD, Maribel Toure, on May 11, 2017.

204.     The contract provided that "[t]he Superintendent shall not be suspended, disciplined, or terminated without just cause and only for alleged acts of material breach of this Agreement neglect of duty, gross misconduct, or disability from performance of his duties according to the evidentiary standard herein set forth and only following a fair hearing before an impartial hearing officer."

205.     Defendants are in non-compliance with the aforementioned express terms of the Contract.

206.     Plaintiff was not provided the procedures which are expressly stated on the contract requiring a hearing before an impartial hearing officer prior to any disciplinary action taken against Plaintiff DR. WARONKER.

207.     DR. WARONKER has endured the disciplinary measure of being put on a leave of absence without a hearing before an impartial hearing officer.

208.     The Defendants represented to Plaintiff, both in oral statements, and upon information and belief, that Plaintiff would not be treated in a retaliatory manner if he exercised his rights to free speech, attempting to correct the problems within the Hempstead School District and reporting any improper wrongful actions.

209.     The Plaintiff was told in essence that he was hired to correct the concerns that existed within their District. Plaintiff relied on these representations and commitments as a term and condition of his employment relationship with Defendants as an inducement to accept said position.

31

210. Defendants collectively and individually committed a breach of contract in that they knowingly, intentionally, and recklessly made false and misleading statements to plaintiff and/or encouraged said actions of each other and their staff, employees, agents and servants. Defendants refused to provide Plaintiff with support to allow Plaintiff to lawfully perform his function and stripped Plaintiff of all authority in an effort to chill his speech, and cripple Plaintiff's ability to make known the serious and unlawful activities which were occurring.

211. Said actions, statements and representations were contrary to the terms provided and promised to Plaintiff. Plaintiff was misled.

212. Plaintiff was informed and/or led to believe that his appointment as Superintendent would be supported and that he would not experience violation of his Freedom of Speech, and/or retaliation for attempting to do his job and raise issues about wrong doing, or what DR.WARONKER reasonably viewed as criminal activity.

213. Defendants acted in bad faith by not abiding by the terms of the Contract and bypassing the procedures set forth to take place prior to any disciplinary measure taken against Plaintiff, DR. WARONKER.

214. Each Defendant owed Plaintiff the duty to see that they adhered to the laws and rules of The United States, the State of New York and County of Nassau and that Plaintiff was dealt with truthfully.

215. Defendants are liable to Plaintiff for breach of contract.

216. As a result of Defendants' acts, Plaintiff suffered and is entitled to, damage sustained to date and continuing in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

## PRAYER FOR RELIEF

a)     On the First Count in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

b)     On the Second Count in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

c)     On the Third Count in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

d)     On the Fourth Count in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

e)     On the Fifth Count in a sum in excess of the jurisdictional limits of all state courts which might otherwise have jurisdiction and this court, costs and attorney's fees as well as equitable and injunctive relief and any other relief this Court may find and just and proper.

f)     Attorney's fees and costs pursuant to 42 U.S.C § 1988 and any other provision of law allowing for such fees and costs;

g)     A Declaratory Judgment that Defendants wilfully violated Plaintiffs' rights secured by federal and state law as alleged herein;

h)     Injunctive relief, requiring Defendants to correct all past violations of federal and state law as alleged herein; to appoint Plaintiffs to the positions that Defendants' illegal actions prevented them from maintaining; to enjoin Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

I)     An order granting such other legal and equitable relief as the court deems just and proper.

### A JURY TRIAL IS HEREBY DEMANDED

Dated: Hempstead, New York
      January 19, 2018

LAW OFFICES OF
FREDERICK K. BREWINGTON

By: _____
    FREDERICK K. BREWINGTON
    *Attorneys for Plaintiff*
    556 Peninsula Blvd.
    Hempstead, New York 11550
    (516)489-6959